IN THE MATTER OF STEVEN MARK WISE.

Suffolk. October 2, 2000. - December 19, 2000.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Attorney at Law,* Disciplinary proceeding, Suspension, Canons of ethics, Conflict of interest, Use of confidence or secret.

The appropriate disciplinary sanction for an attorney's actions, as demonstrated by substantial evidence before a hearing committee of the Board of Bar Overseers, that were in conflict with his client's interest in violation of Canon Five, DR 5-105 (A); that disclosed client confidences in violation of Canon Four, DR 4-101 (B) (1); and that involved communication with persons known to be represented by counsel on the matters in issue in violation of Canon Seven, DR 7-104 (A) (1), all motivated by improper self-interest and retaliation for the client's refusal to pay attorney's fees, was a six-month suspension from the practice of law. [84-90]

INFORMATION filed in the Supreme Judicial Court for the county of Suffolk on December 10, 1999.

The case was reported by *Greaney,* J.

*John W. Marshall,* Assistant Bar Counsel.

*Steven Mark Wise,* pro se.

SPINA, J. On February 24, 1998, bar counsel filed with the Board of Bar Overseers (board) a petition for discipline against Attorney Steven Mark Wise (respondent). The petition alleged that the respondent violated several provisions of the disciplinary rules arising out of a fee dispute with a Texas nonprofit corporate client.[1] The board referred the petition to a hearing committee. S.J.C. Rule 4:01, § 5 (3) (d), 365 Mass. 696 (1974). The committee concluded that the respondent had pursued a course of conduct that was marked by a conflict of interest and that he disclosed client confidences to benefit himself and others, but because his misconduct caused no harm, it recommended that he be suspended from the practice of law for a period of six months.

---

[1]The petition alleged violations of the canons of ethics and disciplinary rules in effect through December 31, 1997.

Bar counsel and the respondent appealed to the board. The board adopted the hearing committee's findings of fact and conclusions of law, but concluded that the appropriate sanction was a public reprimand. Bar counsel notified the board, pursuant to S.J.C. Rule 4:01, § 8 (4), as appearing in 425 Mass. 1311 (1997), that he objected to the sanction of a public reprimand. The board filed an information and record of proceedings with the Supreme Judicial Court for Suffolk County. A single justice of this court reserved and reported the matter to the full court. We order a six-month suspension.

1. *Facts.* We summarize the facts found by the hearing committee and adopted by the board. The respondent concentrates his practice in the area of animal rights law. He represented a Texas nonprofit corporation, Primarily Primates, Inc. (PPI), pro hac vice in a variety of matters beginning in 1991. PPI operates an animal sanctuary near San Antonio. Wallace Swett, the only corporate member of PPI, elected its board of trustees, of which he was a member. He was also the president of PPI and manager of the sanctuary. The respondent's services were authorized by the trustees, through Swett.

In 1992 the respondent represented PPI in a claim against the Doelger Foundation to enforce payment of a grant that was suspended in the face of allegations that PPI had not met certain conditions of the grant. The matter was settled in March, 1993, at which time the trustees, consisting of Swett, Stephen Tello, Kay McMichael-Trevino, and Melissa Karron, approved the respondent's outstanding bills, $59,079.95, for payment from settlement proceeds expected in June.

On June 22, 1993, as sole member of the corporation, Swett elected a new board of trustees, consisting of himself, Stephen Tello, and a third person. In late June, 1993, the respondent requested immediate payment of his fees and costs. On June 30, Swett wrote to the respondent that his bills would not be paid until they were reviewed by the new board, PPI's accountant, and other attorneys. Swett further informed the respondent that he was not authorized to represent PPI on any matter without Swett's approval, other than a particular contract dispute. On July 1, the respondent sent a letter to Trevino, Karron, Tello, and Swett, who he believed were the trustees of PPI, demanding itemization of the disputed portions of his bills and payment of the undisputed portion by July 9.

On July 5, 1993, the respondent spoke with Trevino about his

bills. She told him that the trustees had not authorized Swett's letter of June 30, and that she and Karron disagreed with the refusal to pay him. Trevino also told the respondent that she and Karron had been illegally removed as trustees, and that she intended to notify the Attorney General of Texas that Swett and Tello were misusing PPI funds, not caring properly for the animals, and sexually abusing PPI employees. Many of these same allegations had been made a year before in a complaint by John Hollrah, an animal rights activist, a matter in which the respondent had successfully defended PPI. Trevino expressed the intent to take PPI financial records to substantiate her charges. The respondent asked her to delay making a complaint, as he would inquire first to see if her concerns would be something the Attorney General might pursue, and how best to present them. In subsequent conversations, Trevino and Karron asked the respondent to assist them to freeze PPI's bank accounts, to force Swett to relinquish exclusive control over PPI, and to achieve financial accountability from PPI's officers and trustees.

The respondent placed an anonymous call to Texas Assistant Attorney General John Vinson, at the request of Trevino and Karron, and informed him of the details of the dispute. He also asked officers at two financial institutions holding PPI assets to freeze PPI's assets because of an internal dispute that included accusations of misconduct. No bank account was actually frozen. On July 7, 1993, with the approval of Trevino and Karron, the respondent transmitted by facsimile a letter to Swett and Tello, who were out of the country, announcing that he was representing PPI on behalf of Trevino and Karron. The respondent provided details of their accusations, including a revival of the Doelger and Hollrah matters, in which he took contrary positions from those taken when he defended PPI. He also raised the issue of Swett's refusal to honor the agreement to pay his fees, and he reported that the Attorney General of Texas had been apprised of the situation, that corporate funds had been frozen, and that both Swett and Tello were suspended and relieved of their duties. He added that the Attorney General, Trevino, and Karron would seek a receivership of PPI if all matters were not settled in a manner acceptable to Trevino and Karron by July 9, the date Swett and Tello were scheduled to return from their trip abroad. PPI was a corporate client of the respondent at this time and it had not authorized his representation of Trevino and Karron.

Swett retained Attorney Karl Hays of Texas to represent PPI in the matter. Hays called the respondent on July 9 to advise that he was representing PPI. Hays asked the respondent to explain his concerns about PPI, which he did, including the allegations from the Hollrah matter. The respondent forwarded copies of the Hollrah documents to Hays. After investigating the matter, Hays transmitted by facsimile a letter to the respondent on July 13, advising him that Trevino and Karron were not trustees of PPI and that the respondent was not authorized to represent the corporation in any matter except pending litigation. Hays further requested the respondent to direct all communications to PPI through his office.

On July 13, 1993, after receiving Hays's letter, the respondent spoke with Trevino and Karron, who authorized him to discuss their dispute openly with Assistant Attorney General Vinson, which he then did. Trevino delivered a letter to Vinson the same day, outlining her concerns about Swett and including financial records about PPI and documents from the Hollrah matter. She was Vinson's sole source of documents about PPI. On July 19, Swett and Tello sent a letter to the respondent terminating his services, and requesting his withdrawal from PPI litigation and the return of his files. On July 21, the respondent responded directly to Swett and Tello by letter, without first obtaining Hays's consent, questioning their authority and refusing to cease his activities until so instructed by a majority of the board of trustees. On July 21, the respondent informed Vinson about his fee dispute, explaining that "it could be used to impugn my motives."

On July 14, 1993, the day after the respondent and Trevino contacted the Attorney General's office, Hays filed suit against Trevino, Karron, and the respondent and obtained an ex parte order restraining them from interfering with PPI's operations and from representing themselves as officers or agents of PPI. On July 30, the Attorney General intervened with a receivership action. Trevino and Karron were defaulted for failure to defend. The respondent removed PPI's case to Federal court, which subsequently granted summary judgment in favor of the respondent because PPI failed to establish actual damages. PPI and the Attorney General reached a settlement that required PPI to expand its membership and create a seven-member board of trustees.

The hearing committee found that "the [respondent's]

conduct demonstrates that his primary motivation was retaliation against Swett and Tello for their refusal to pay his fees and collection of those fees." It concluded that, by assisting and representing Trevino and Karron in their efforts to require Swett to relinquish his exclusive control of PPI, the respondent violated S.J.C. Rule 3:07, Canon 5, DR 5-101 (A), as appearing in 382 Mass. 779 (1981) (accepting employment and acting in a matter in which the exercise of professional judgment was or could reasonably be affected by personal or business interests, without the informed consent of the client), and DR 5-105 (A), as appearing in 382 Mass. 781 (1981) (engaging in concurrent and successive conflicts of interest and breach of duty of loyalty and neutrality to client). The hearing committee also found that the respondent violated S.J.C. Rule 3:07, Canon 4, DR 4-101 (B) (1), as appearing in 382 Mass. 778 (1981) (lawyer shall not knowingly reveal a confidence or secret of client), and DR 4-101 (B) (3), as appearing in 382 Mass. 778 (1981) (lawyer shall not knowingly use a confidence or secret of his client for the advantage of himself or of a third person unless client consents after full disclosure), by informing Assistant Attorney General Vinson and two financial institutions holding PPI assets that PPI was in the throes of an internal dispute, that it was suffering from mismanagement, and that its trustees and officers were engaged in misconduct. The hearing committee further concluded that the respondent violated S.J.C. Rule 3:07, Canon 7, DR 7-104 (A) (1), as appearing in 382 Mass. 786 (1981) (lawyer shall not communicate with party known to be represented by counsel on the subject of the representation), by writing directly to Swett and Tello on July 21, 1993, after Hays notified him that Hays was representing PPI in this dispute.

2. *Bar counsel's appeal.* (a) Bar counsel challenges as contrary to the facts the board's conclusions that the respondent did not violate S.J.C. Rule 3:07, Canon 4, DR 4-101 (B) (2), as appearing in 382 Mass. 778 (1981) (lawyer shall not knowingly use a client confidence to the disadvantage of a client), or S.J.C. Rule 3:07, Canon 7, DR 7-101 (A) (3), as appearing in 382 Mass. 784 (1981) (lawyer shall not intentionally prejudice or damage his client during the course of the professional relationship). In reaching these conclusions the board adopted the hearing committee's finding that PPI did not suffer harm or disadvantage as a result of the respondent's conduct. Bar counsel correctly points out that harm encompasses more than

financial damages or monetary loss. See *Matter of Dawkins*, 412 Mass. 90, 94 (1992) (client subjected to lawsuits and issuance of capias); *Matter of Eastwood*, 10 Mass. Att'y Discipline Rep. 70, 74-75 (1994) (clients subjected to criminal and civil penalties). He argues that PPI was harmed because it was forced to retain Hays to enjoin the respondent's misconduct and to defend itself against a receivership action.

The board concluded that Trevino had been preparing to press her concerns about the management of PPI with the Attorney General's office and that the Attorney General likely would have taken the action it did "even if [the respondent] had stayed out of the conflict." The hearing committee reached essentially the same conclusion, noting further that Trevino sent a letter to the Attorney General's office detailing the allegations, and that she was the sole source of documents provided to the Attorney General concerning PPI. The findings of the hearing committee as to the causal relation between the actions of Trevino and Karron and the harm to PPI were not speculative, as bar counsel contends, but were supported by substantial evidence.

(b) The board also adopted the hearing committee's conclusion that the respondent did not violate S.J.C. Rule 3:07, Canon 7, DR 7-101 (A) (1) (lawyer shall not intentionally fail to seek the lawful objectives of client). Bar counsel argues that the respondent violated this rule by disclosing PPI's confidences to the Attorney General's office, and that the disclosure was directly contrary to PPI's objective to resolve its internal disputes privately.

Although the respondent claimed in his letter of July 7 that he represented PPI, he had not been authorized by a majority of the board of trustees to represent the corporation in the dispute initiated by Trevino and Karron. The board was correct in reasoning that DR 7-101 (A) (1) presupposes that the respondent represented the client on the matters at issue. Here, the respondent represented Trevino and Karron, not PPI, and thus he could not intentionally have failed to seek the lawful objectives of PPI. There is no claim that he intentionally failed to seek the lawful objectives of PPI in matters for which he had been retained by the corporation. Further, DR 7-101 (A) (1) requires a showing of prejudice, which the board correctly concluded had not been made.

Bar counsel's reliance on the current Mass. R. Prof. C. 1.13(b),

426 Mass. 1302 (1998), is misplaced. That rule did not become effective until January 1, 1998, after the events here had taken place. It is therefore not applicable to this controversy.

(c) The board made certain conclusions that bar counsel argues invaded the hearing committee's role as "sole judge of the credibility of the testimony presented at the hearing." S.J.C. Rule 4:01, § 8 (4), as appearing in 425 Mass. 1311 (1997). *Matter of Tobin*, 417 Mass. 81, 85-86 (1994). *Matter of Saab*, 406 Mass. 315, 328 (1989).

Bar counsel challenges the board's conclusion that the respondent "believed he had authority for the actions he took." The only basis for this conclusion was the respondent's testimony that he believed he was general counsel to PPI. The hearing committee implicitly rejected this testimony, finding only that the respondent "was retained . . . on approximately fourteen different cases." Although the respondent claimed to be general counsel, he could point to no services he provided that would reasonably lead to that belief. He had not been asked to review any internal corporate papers or corporate filings, and he had not attended any meetings of the board of trustees. He also relied on his first fee agreement letter with PPI for his assertion, but that letter was an agreement to provide services in a particular matter, and nowhere in that agreement was he referred to as general counsel. PPI only agreed that he would be "sole counsel" in the particular matter. The respondent cited no writing or vote of the board of trustees authorizing his actions in the dispute between its members. At best, the trustees were evenly divided, so there was no majority of trustees who could have authorized his actions. Where there was no reasonable basis for the respondent to have believed he was general counsel and where the hearing committee did not accept his testimony on the point, there was no basis for the board's conclusion.

Bar counsel similarly challenges the board's conclusion that the respondent's "judgment was clouded . . . by his devotion to the cause of animal rights." The board's conclusion, stated in its entirety, is that the respondent's "judgment was clouded both by his pecuniary interest in getting his legal bills paid and by his devotion to the cause of animal rights." Bar counsel relies on the respondent's testimony, expressly rejected by the hearing committee, that his desire to collect his fees had "zero effect," and that he was motivated solely by his "concern[] about animals." The hearing committee was not required to

reject the respondent's testimony outright, contrary to bar counsel's contention, and could have found that the respondent was motivated in part by his concern for animals. The hearing committee found that "his primary motivation was retaliation against Swett and Tello for their refusal to pay his fees and collection of those fees." It did not find that the respondent had only one motive. By finding as it did, the hearing committee implicitly acknowledged that the respondent's concern for animals may have been a secondary motive. The board expressly made that conclusion. See S.J.C. Rule 4:01, § 8 (4). There was no error in the board's conclusion.

3. *The respondent's appeal.* (a) The respondent argues that the hearing committee's finding that "his primary motivation was retaliation against Swett and Tello for their refusal to pay his fees and collection of those fees" was not supported by substantial evidence. "The scope of our inquiry is limited. While we review the entire record and consider whatever detracts from the weight of the board's conclusion, as long as there is substantial evidence, we do not disturb the board's finding." *Matter of Segal,* 430 Mass. 359, 364 (1999). See S.J.C. Rule 4:01, § 8 (4) ("subsidiary facts found by the [b]oard . . . shall be upheld if supported by substantial evidence").

In his letter of June 25, 1993, in which he requested immediate payment of his outstanding bills for $59,079.95 in seven matters, the respondent indicated that his law firm had "suffered serious financial hardship for many months . . . wait[ing to be paid]." In his letter of July 1, the respondent angrily explained to the trustees that he had "worked for months without being paid," and he "advanced heavy costs" on behalf of PPI. When he wrote to the assistant attorney general on July 21 about his unpaid bills, he acknowledged that the issue "could be used to impugn [his] motives." There was substantial evidence that the respondent's outstanding bills were weighing heavily on him. In his letter of July 7 to Swett and Tello, the respondent enveloped the various claims of Trevino and Karron around his own claim for fees. There is substantial evidence that the issue of his unpaid bills was at the fore of his representation of Trevino and Karron. The respondent's willingness to assist Trevino and Karron in their accusations of mismanagement and misconduct against Swett by taking the opposite position in the Doelger and Hollrah matters from what he took when defending PPI is substantial evidence of his retaliatory intent. There was no error.

The respondent cites several points that he argues weigh against the hearing committee's finding. The strongest of these is his testimony that his sole concern was his duty to PPI and his concern for animals. The hearing committee expressly rejected that testimony. They are the sole judges of the credibility of the witnesses, and notwithstanding the respondent's argument that his testimony must be accepted because it was uncontradicted, they were not required to believe his testimony. See *Matter of Tobin, supra*. S.J.C. Rule 4:01, § 8 (4). His testimony was indeed contradicted by substantial evidence. The other points similarly fail.

(b) The respondent challenges the board's conclusion that he violated the duty to remain neutral, in violation of Canon 5, DR 5-105 (A), as appearing in 382 Mass. 781 (1981). Relying on S.J.C. Rule 3:07, Canon 4, DR 4-101 (C), as appearing in 382 Mass. 778 (1981), which states that "[a] lawyer may reveal: . . . (3) the intention of his client to commit a crime and the information necessary to prevent the crime," he argues that he took action against Swett and Tello because they were committing crimes against his corporate client, PPI.

In his letter of July 7, 1993, to Swett and Tello, however, the respondent identified no crime that Swett and Tello were intending to commit. The letter refers to mismanagement, wasting PPI's money, and "inappropriate behavior, including [Swett's] sullenness, hostility, sudden mood shifts, and sexual harassment of men." His demand that they come up with "a solution to . . . all . . . problems caused by you that is acceptable to . . . Trevino and . . . Karron" by 5 P.M. on July 9 suggests a civil, not a criminal, matter. The evidence does not show the respondent trying to prevent the commission of crimes against PPI. It shows him embroiled in an internal power struggle at PPI, which he tried to use to punish Swett and Tello for refusing to pay his bill, and to collect his fee.

The respondent's response that "[t]here was no 'internal dispute over control' of PPI," and that "Trevino and Karron did not want control . . . [or] seek control," is not credible. The respondent himself testified that Trevino and Karron wanted Swett to relinquish control. He wrote to PPI's asset manager on July 7, 1993, and explained that Trevino and Karron were "preparing a suit to place PPI into receivership if Mr. Swett and Mr. Tello [do not] voluntarily relinquish control," and that, "[m]eanwhile, they do not authorize Mr. Swett or Mr. Tello to

withdraw any funds." Trevino wrote to the assistant attorney general on July 12, 1993, that the trustees had "repeatedly tried to wrestle control . . . from Mr. Swett." None of the participants ever viewed this dispute as anything other than an internal corporate power struggle. Nowhere in these letters does it appear that the respondent was trying to prevent the commission of a crime.

In the course of his representation of Trevino and Karron, the respondent took positions in the Doelger and Hollrah matters that were contrary to the positions he had previously taken in those matters. His representation in those matters necessarily included representation of Swett. As such, his representation of Trevino and Karron was conflicted, and violated DR 5-105 (A). See G. Tuoni, Massachusetts Att'y Conduct Manual 5-96 to 5-102, 5-117 to 5-120 (1992). Even if, as he claims, he represented only PPI and not Trevino and Karron, he should have realized that he had a conflict with Swett. The respondent should have remained neutral in the Trevino-Karron dispute, and advised them, and PPI, to engage other counsel, regardless of who he understood was purporting to act for PPI.

(c) The respondent argues that the hearing committee and the board erroneously concluded that he violated Canon 4, DR 4-101 (B) (1), by revealing a confidence or a secret of his client, and that he aggravated this violation by doing so for Trevino's, Karron's, and his own advantage. See DR 4-101 (B) (3). He again relies on DR 4-101 (C) (3), which permits disclosure of a client's intention to commit a crime.

For the reasons discussed in Part 3(b), *supra*, DR 4-101 C (3) does not apply. The respondent never outlined any criminal act which Swett and Tello intended to commit. He never indicated he would present evidence of any such intended criminal conduct to the appropriate prosecutorial agency. Instead, he outlined a number of corporate issues in his letter of July 7 that he demanded Swett and Tello settle to the satisfaction of Trevino and Karron. His disclosure to the Attorney General and to PPI's financial institutions of the confidential internal corporate matters described in his July 7 letter, for the purpose of excluding Swett and Tello from participation in PPI's day-to-day business, violated DR 4-101 (B) (1). Where the disclosure was made for the benefit of Trevino, Karron, and himself, it further violated DR 4-101 (B) (3). There was no error.

(d) The respondent challenges the board's conclusion that he violated Canon 7, DR 7-104 (A) (1), by sending a letter to Swett and Tello on July 21, 1993, after being asked by Attorney Hays to direct all communication to PPI through his office. He bases his argument on the point that Swett and Tello lacked authority to hire Hays to represent PPI and thus Hays could not have spoken as PPI's attorney. It is true that in the absence of express authority under the by-laws of the corporation, or unless specifically authorized by the trustees, Swett, as president, had no authority to hire an attorney to represent PPI. See *Valley Int'l Props., Inc.* v. *Brownsville Sav. & Loan Ass'n*, 581 S.W.2d 222, 227 (Tex. Ct. App. 1979).

The respondent acknowledged in his letter to Swett and Tello, however, that he "believe[d] that Karl Hays represents [them] solely in [their] individual capacities." He acknowledged, further, that because they wrote to him, he would respond directly to them, "though ordinarily I would not communicate to persons represented by counsel." Assuming that Hays was representing Swett and Tello in their individual capacities, there can be no doubt that the subject of that representation included the issue of their authority to act for PPI, and that as such they were disputing the authority of Trevino and Karron to act for PPI. The nature of Swett and Tello's challenge was laid out in Hays's July 12 letter to the respondent. Because the respondent's response to Swett and Tello went to their authority to act for PPI, and therefore the subject of Hays's representation, his letter should have been sent to Hays. The respondent's letter to Swett and Tello violated DR 7-104 (A) (1).

4. *Disposition.* Bar counsel urges us to adopt the recommendation of the hearing committee and order that the respondent be suspended from the practice of law for six months. The respondent, who insists that he conducted himself "in the finest tradition of the Massachusetts bar," asks us to dismiss the charges, or, alternatively, issue nothing more severe than a public reprimand.

Bar counsel relies on several cases where six-month suspensions were imposed. In *Matter of Thurston*, 13 Mass. Att'y Discipline Rep. 776, 792 (1997), the respondent secretly assisted one of two equal shareholders who transferred all of their corporation's assets to himself while the other relied on the respondent as corporate counsel. *Matter of Taglino*, 9 Mass. Att'y Discipline Rep. 318, 319 (1993), involved an attorney

who failed to make adequate disclosure to the seller in a commercial real estate transaction, his client, that the buyer, whom he also represented, was a regular client. The respondent drafted a mortgage of other land owned by the buyer as additional security with the knowledge that it afforded little or no protection. He also caused the seller to subsequently release his existing mortgages and substitute new mortgage financing that was disadvantageous. The respondent in *Matter of Tobin*, 7 Mass. Att'y Discipline Rep. 290, 292, 294-295 (1991), was suspended for one year for representing parties to real estate transactions whose interests differed, without disclosing the conflict. In one case he "unconscionabl[y]" caused an "unsophisticated homeowner to transfer to him, as trustee . . . the equity in her home in exchange for being saddled with financial commitments that he and his clients must have known she could not meet." *Id.* at 294. We ordered a six-month suspension of the respondent in *Matter of Pike*, 408 Mass. 740 (1990), who represented a tenant in lease negotiations with a landlord without disclosing that he served as the landlord's broker in the same matter. The client suffered harm when it was subsequently discovered that the local zoning by-law barred use of a portion of the leased premises for retail purposes, the basis for the client's rental of the space.

The respondent argues that those cases are distinguishable because in each the client was harmed, and the attorney either had perpetrated a fraud on the client or had exploited a vulnerable client. The cases on which bar counsel relies are good authority for a six-month suspension. Although the hearing committee and the board concluded that the harm to PPI was a result of Trevino's independent actions, the respondent counseled her on how best to inflict that harm by laying the foundation for her to contact Assistant Attorney General Vinson, as he did himself. The evidence is compelling that the respondent intended that harm to flow. Although the respondent did not act secretly or deceptively, his conduct was just as reprehensible. Moreover, there is nothing to suggest that the respondent acknowledges any wrongdoing, and he has shown no remorse.

The cases put forth by the respondent in support of a public reprimand are distinguishable. In *Matter of Roberts*, 9 Mass. Att'y Discipline Rep. 271 (1993), the respondent received a public censure for representing clients having conflicting

interests. There was a full, but delayed, disclosure. The clients otherwise were represented diligently, and the respondent did not benefit financially. The respondent in *Matter of Warren*, 8 Mass. Att'y Discipline Rep. 260 (1992), received a public censure for suing a client on a bill and attaching her home without her knowledge, while continuing to represent her. In *Matter of Dionisi*, 9 Mass. Att'y Discipline Rep. 99 (1993), a public censure was imposed on the respondent for representing a client in a transaction in which the respondent's mother had a financial interest, without disclosing the conflict and obtaining the client's consent. None of those cases involved a disclosure of client confidences or the vengeful attitude toward the client that is present here. Nor was a selfish motive as dominant as here.

We are satisfied that a six-month suspension is required. The respondent's actions were marked by a conflict of interest, the disclosure of client confidences, and communication with persons known to be represented by counsel on the subject of his communication. His multiple serious ethical violations were motivated by selfishness and anger. The respondent's reinstatement shall be on the condition that he take and pass the multi-State professional responsibility examination.

*So ordered.*