## In the Matter of Robert N. Lupo.

Suffolk. April 3, 2006. - July 28, 2006.

Present: Marshall, C.J., Greaney, Ireland, Spina, Sosman, & Cordy, JJ.

*Attorney at Law,* Disciplinary proceeding, Suspension, Conduct prejudicial to administration of justice, Attorney-client relationship, Conflict of interest. *Restitution. Due Process of Law,* Attorney disciplinary proceeding.

In a bar discipline case, there was substantial evidence to support each of the violations found by the Board of Bar Overseers, including that the respondent's conduct in filing a lawsuit against another attorney because she had filed a grievance against the respondent was prejudicial to the administration of justice and adversely reflected on the respondent's fitness to practice law, as well as that an attorney-client relationship existed between the respondent and his aunt, who was harmed by agreeing to a transaction with a man she trusted when the terms were not fair to her or fully disclosed. [355-358]

This court concluded that an indefinite suspension from the practice of law was the appropriate sanction for an attorney who engaged in clear personal conflicts of interest with elderly, unsophisticated, and vulnerable clients [358-360]; further, while restitution to the estate of one of his elderly clients was appropriate, this court remanded the matter to the Board of Bar Overseers for a determination of the appropriate amount [360-361].

An attorney's due process claim concerning his disciplinary hearing was no more than speculation. [361-362]

Information filed in the Supreme Judicial Court for the county of Suffolk on December 1, 2005.

The case was reported by *Greaney*, J.

*John W. Marshall*, Assistant Bar Counsel.

*Edward Foye (Heidi A. Nadel* with him) & *Brian J. Kelly* for the respondent.

Marshall, C.J. The principal issue in this case is whether a two-year suspension from the practice of law recommended by a divided Board of Bar Overseers (board) is the appropriate sanction for the conduct of an attorney that the hearing committee of the board (hearing committee) characterized as "clear, personal conflicts of interest with elderly, unsophisticated and

vulnerable clients." For the reasons we shall explain, we agree with four members of the board who voted against the motion to adopt the report of the appeal panel of the board (appeal panel) and its recommendation of a two-year suspension, and conclude that a more severe sanction is warranted. An indefinite suspension from the practice of law is the appropriate sanction in this case. The respondent shall also make restitution, as we explain below, before petitioning for reinstatement. Finally, we consider and reject the respondent's claim that he was deprived of his right to due process in the disciplinary proceedings.

1. *Background.* In August, 2001, bar counsel filed a two-count petition for discipline against the respondent in connection with his representation of five elderly sisters[1] (count one) and his transactions with his elderly aunt (count two), seeking an indefinite suspension. After extensive hearings, at which almost 200 exhibits were admitted in evidence, bar counsel and the respondent each filed proposed findings. Because resolution of this case turns on specific facts, we summarize the facts in some detail before turning to the disciplinary proceedings against the respondent.[2] We begin with the respondent's professional experience, then turn to the facts underlying the two counts charged by bar counsel.

The respondent, a solo practitioner concentrating in the practice of real estate law, has been a member of the Massachusetts bar since December, 1974. He became a licensed real estate broker in January, 1975, and owns a number of rental properties. He operates both businesses from his office in Waltham.

a. *Count one.* The first count concerns the respondent's representation as both lawyer and real estate broker of five elderly sisters, the termination of that relationship, and the respondent's subsequent lawsuit against the sisters and their new attorney. Central for our purposes is the conflict of interest arising from the respondent's dual role. Briefly stated, the sisters

[1]Emilia Warren, Dora Jasset, Yolanda Antico, Edith Jacobs, and Eleanor Pendergast.

[2]We summarize the facts as found by the hearing committee and subsequently adopted by the appeal panel and the full board, supplementing where necessary from the uncontested facts in the record.

sought to sell an undeveloped parcel of land they had jointly inherited. The parcel presented complex street access problems for potential buyers who might wish to develop the parcel. The eldest sister first retained the respondent to provide legal representation to the sisters in the matter,[3] while the sisters engaged a real estate broker, Martin Coleman, to broker the sale of their property nonexclusively for a commission of five per cent.

After receiving and rejecting several offers, the sisters, through Coleman, contacted Mark Rogers, a prospective buyer-developer who had previously expressed interest in the property, requesting a higher figure than he had offered. Rogers responded to Coleman with an offer of the requested amount. As found by the hearing committee, on March 25, 1998, at the request of the husband of one sister, Coleman communicated the Rogers offer to the respondent (but not the sisters), although Coleman had received it from Rogers sometime before the first week of March.

In the meantime, the respondent sought to become the broker for the sisters. On March 11, 1998, he met with three of the sisters to discuss listing their property on the multiple listing service (MLS) and to discuss executing a listing agreement with him to enable him to list the property.[4] The respondent asked the sisters to sign a standard form listing agreement providing for an exclusive right to sell the property. As found by the hearing committee, the sisters had difficulty filling in the forms, and the respondent asked them to sign the forms with some of the information, including his fee, not yet specified. The hearing committee found that there was "no meeting of the minds as to the amount of the commission."

---

[3]The eldest and one other sister executed a legal services fee agreement with the respondent and paid him a retainer of $2,500. At the time, the respondent agreed orally that, until the property was sold, he would not further bill or attempt to collect for any legal services he might provide to the clients.

[4]The respondent did not advise the sisters that they should seek independent counsel in connection with signing a brokerage agreement with the respondent, nor did he obtain their consent to the potential conflict of interest between his service to them as an attorney and as a real estate broker. The hearing committee found that the respondent did not perceive any conflict of interest and therefore did not disclose it or obtain his clients' consent.

Following the March 11 meeting, the respondent listed the property on MLS, while he attempted to obtain the signatures of the other two sisters on the listing agreement. On March 25, 1998, Coleman communicated the Rogers offer to the respondent. On May 5, 1998, after the property had been listed on MLS, the respondent received a second offer from a different prospective purchaser. The respondent did not inform his clients of either offer until a meeting with two of the sisters on May 21, 1998, at which he described the offers generally, informing the sisters falsely that both offers had come through the MLS listing. He also told the two sisters that he could not "move forward" with the offers until the listing agreement was signed by all five sisters, one of whom had not yet signed it.

On June 3, 1998, the respondent met with the sisters, Randall Jacobs,[5] and attorney Kathleen Pendergast, the daughter of one of the sisters. The parties discussed the legal services agreement and the listing agreement. They amended the former to reflect the respondent's prior oral agreement to defer charging for his services until the property was sold, see note 3, *supra*.[6] At Pendergast's request, the respondent provided the sisters with the listing agreement signed on March 11, 1998. The sisters then noted that a commission fee in the amount of ten per cent had been written into the space that had previously been blank, and a dispute ensued.[7] In the course of the meeting, Pendergast and Jacobs asked to see the two offers that had been made for the property. As the hearing committee found, the respondent showed the offers to Pendergast but not to Jacobs or the sisters, and refused to discuss them until the listing agreement had been

---

[5]Four of the sisters were present at the meeting. Randall Jacobs, who holds the power of attorney of the fifth sister, his mother, participated by telephone.

[6]In connection with the execution of this agreement, Pendergast asked for, and the respondent agreed to provide, a statement itemizing his past legal services.

[7]The respondent and his associate claim that the respondent told the sisters in March that the commission would be ten per cent, and that they agreed to that amount. The sisters claim that they agreed to a two and one-half per cent commission. The hearing committee credited the testimony of "various witnesses" to the effect that a ten per cent commission for undeveloped land was reasonable.

signed.[8] The parties then agreed to a broker's fee of eight per cent of the sale price of the land up to $1.5 million and six per cent for any amount over $1.5 million.[9] After they signed the agreement, the respondent then discussed the two offers he had received. The sisters agreed to pursue the Rogers offer, which ultimately was not successful. As of October, 2002, the property had not been sold.

The sisters subsequently learned that the Rogers offer presented to them by the respondent in June was the same offer that Coleman had received earlier. They then retained Pendergast as their lawyer and in July, 1998, Pendergast terminated the respondent's services as the sisters' lawyer and broker. She also filed a grievance concerning the respondent with the Office of Bar Counsel.

The respondent then commenced a lawsuit against Coleman, Pendergast, and the sisters, seeking compensation for his legal and brokerage services, and damages for breach of the brokerage agreement. He also filed a claim against Pendergast seeking damages for her filing of the grievance against him. The latter claim was dismissed on Pendergast's motion; the remaining claims and counterclaims were dismissed when the sisters and the respondent executed a settlement agreement.

b. *Count two.* This count concerns claims of self-dealing by the respondent in connection with his providing legal services, including estate planning services, for his elderly aunt, Eleanor L. Lupo.[10,11] In late 1999 and early 2000, the respondent's aunt sought his advice concerning payment of her living expenses

---

[8]Pendergast was allowed to review the offers "earlier in the meeting," but neither Jacobs nor the sisters had seen the written offers. Furthermore, the respondent told the sisters that they were "free to leave and retain another attorney, but he would not discuss the offers unless they signed the brokerage agreement."

[9]The hearing committee found that the agreement signed at this time, which also included an exclusive right to sell the property, contained the same terms as the previous agreement with the exception of the amount of the commission.

[10]The respondent's aunt died at the age of ninety-eight years, after the record closed in the proceedings.

[11]The respondent had provided legal services to his aunt over a number of years. In 1993, the respondent drafted a will for her, which she executed that year, together with a health proxy designating the respondent as the holder. In 1997, she executed a springing power of attorney, again naming the

from assets she held, including her house in Newton. The respondent discussed with his aunt her eligibility for Medicaid assistance in the event that she should enter a nursing home, and advised her, as the hearing committee found, that she would have to "spend-down" her funds if she sold her house in order to qualify for such assistance.

The respondent's aunt entered a nursing home in January, 2000. In March, 2000, the respondent purchased his aunt's house from her for $170,000. In connection with this transaction, the respondent obtained and shared with his aunt an appraisal characterized by the hearing committee as a "drive-by" in which the appraiser viewed the outside of the house and "relied on the [r]espondent's description as to the inside,"[12] which valued the property at $170,000. The hearing committee found that, at the time of the purchase, the respondent knew that the fair market value of his aunt's property was "substantially" more than his purchase price, and was at least $240,000.[13] He failed to inform his aunt of this fact. The hearing committee concluded that the respondent "knowingly misrepresented" the value of the property to his aunt in order to purchase it from her for substantially less than its fair market value.

The hearing committee also found that the respondent did not advise his aunt to obtain the advice of independent counsel regarding Medicaid eligibility and the advisability of selling her house to the respondent. Despite the respondent's claim to the

respondent as the holder.

[12]Appraisals conducted in connection with loan applications valued the property with two bedrooms on the first floor and one on the second floor. The appraisal conducted in connection with the respondent's purchase of the house did not include the second-floor bedroom.

[13]The hearing committee based its finding on several subsidiary facts unchallenged by the respondent. These include a commitment letter for a loan of $192,020 that the respondent's aunt received in connection with a reverse mortgage for which the respondent assisted her in applying in the fall of 1999. Although never executed, the respondent, as a real estate broker, was aware of prevailing loan-to-value ratios and he listed the market value of the home, on the mortgage application, as $250,000. After his aunt signed the deed to the property, the respondent filed a mortgage application for a loan of $175,000 and again, as the hearing committee found, based on loan-to-value ratios disclosed to all loan applicants, the respondent "was aware that he could only get a loan in the amount of $175,000 if the property were valued at $250,000." The bank approved a loan for $171,500.

contrary, the hearing committee found that the respondent was not "simply acting as a nephew" in advising his aunt, but was "providing his aunt with legal services." The hearing committee noted that the respondent had a fiduciary obligation to his aunt under the power of attorney,[14] and a "personal business interest," as one who owned and rented residential properties, in acquiring his aunt's house for himself.

In 2000, another nephew of the respondent's aunt, Thomas Gallinelli, learned of the house transaction between the respondent and his aunt. He retained an attorney to ascertain the facts. At his aunt's request, Gallinelli assisted her in executing a revocation of the durable power of attorney held by the respondent, and executing a new durable power of attorney appointing Gallinelli and another cousin as her attorneys in fact. Gallinelli requested that the respondent provide a final accounting, bankbooks, and other assets belonging to his aunt. The hearing committee found that, although the respondent initially agreed to produce the records, he then "questioned the validity" of the documents and "demanded" that Gallinelli sign an indemnification agreement and provide verification that his aunt wished to transfer control of her affairs before providing the accounting to Gallinelli.[15] The hearing committee concluded that it was "improper" to demand the indemnification as a prerequisite to the accounting, regardless of any concerns the respondent might have had.

We turn now to the disciplinary proceedings against the respondent.

2. *Proceedings below.* In November, 2004, the hearing committee issued its findings of facts and conclusions of law. It recommended that the respondent be suspended from the practice of law for a period of one year. We begin with the

[14]The hearing committee characterized the relationship between the respondent and his aunt as follows: "[B]ecause the [r]espondent had [his aunt's] power of attorney and had kept all of the original documents [related to the sale of her house], including the discharge, her rights in relation to the [r]espondent with respect to this transaction were completely in his hands."

[15]By the time the hearing committee prepared its report the respondent had not provided an accounting, nor had he done so by the date of the appeal panel report.

report of the hearing committee, then turn to subsequent proceedings.

a. *Hearing committee: count one.* Bar counsel charged that on March 11, 1998, the respondent had deliberately misrepresented the amount of his commission to the sisters to induce them to sign the listing agreement, in violation of Mass. R. Prof. C. 8.4 (c) and (h), 426 Mass. 1429 (1998).[16],[17] The hearing committee concluded that the respondent's actions violated rule 8.4 (h), but that the respondent had not violated rule 8.4 (c) because he had not intentionally induced the sisters to sign blank agreements in order to set the fee himself.

The hearing committee further concluded that the respondent violated Mass. R. Prof. C. 1.8 (a), 426 Mass. 1338 (1998),[18] because he had not fully disclosed to his clients the ramifications of his actions and because his clients were not given any opportunity to seek the advice of independent counsel. By continuing to represent the sisters as their attorney after the parties entered into the listing agreement, the hearing committee concluded, the respondent had violated Mass. R. Prof. C. 1.7 (b), 426 Mass. 1330 (1998).[19] The hearing committee also concluded that the respondent's failure to convey the Rogers

[16]Rule 8.4 (c) of the Massachusetts Rules of Professional Conduct, 426 Mass. 1429 (1998), provides: "It is professional misconduct for a lawyer to: . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

[17]Rule 8.4 (h) of the Massachusetts Rules of Professional Conduct, 426 Mass. 1429 (1998), provides: "It is professional misconduct for a lawyer to: . . . engage in any other conduct that adversely reflects on his or her fitness to practice law."

[18]Rule 1.8 (a) of the Massachusetts Rules of Professional Conduct, 426 Mass. 1338 (1998), provides: "A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client unless:

"(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

"(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

"(3) the client consents in writing thereto."

[19]Rule 1.7 (b) of the Massachusetts Rules of Professional Conduct, 426 Mass. 1330 (1998), provides, in pertinent part: "A lawyer shall not represent a client if the representation of that client may be materially limited by the

offer[20] to the sisters promptly on receipt, and his refusal to disclose two outstanding offers to the sisters until all five had signed the listing agreement, constituted a violation of Mass. R. Prof. C. 1.2 (a), 426 Mass. 1310 (1998)[21]; Mass. R. Prof. C. 1.4 (a), (b), 426 Mass. 1314 (1998)[22]; and rule 8.4 (h).

Finally, bar counsel charged, and the hearing committee found, that the respondent's commencement of a civil action seeking damages from Pendergast violated Mass. R. Prof. C. 8.4 (d), 426 Mass. 1429 (1998),[23] and rule 8.4 (h), because her grievance filed against him was absolutely privileged and immune from civil liability pursuant to S.J.C. Rule 4:01, § 9 (1), as appearing in 425 Mass. 1312 (1997).[24,25]

---

lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

"(1) the lawyer reasonably believes the representation will not be adversely affected; and

"(2) the client consents after consultation."

[20]The appeal panel noted that although the hearing committee's findings of fact state that the respondent did not promptly inform his clients of either offer, its rulings of law refer only to the Rogers offer in this respect, and assumed that the latter was "a drafting oversight."

[21]Rule 1.2 (a) of the Massachusetts Rules of Professional Conduct, 426 Mass. 1310 (1998), provides, in pertinent part: "A lawyer shall seek the lawful objectives of his or her client through reasonably available means permitted by law and these rules."

[22]Rule 1.4 (a) of the Massachusetts Rules of Professional Conduct, 426 Mass. 1314 (1998), provides: "A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information."

Rule 1.4 (b) of the Massachusetts Rules of Professional Conduct, 426 Mass. 1314 (1998), provides: "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

[23]Rule 8.4 (d) of the Massachusetts Rules of Professional Conduct, 426 Mass. 1429 (1998), provides: "It is professional misconduct for a lawyer to: . . . engage in conduct that is prejudicial to the administration of justice."

[24]Supreme Judicial Court Rule 4:01, § 9 (1), as appearing in 425 Mass. 1312 (1997), provides: "Complaints submitted to the Board or to the bar counsel shall be confidential and absolutely privileged. The complainant shall be immune from civil liability based on his or her complaint; provided, however, that such immunity from suit shall apply only to communications to the Board or the bar counsel and shall not apply to public disclosure of information contained in or relating to the complaint."

[25]Bar counsel further charged that the respondent violated rule 1.8 (a) and

b. *Hearing committee: count two.* The hearing committee determined that the respondent violated rule 8.4 (c) and rule 8.4 (h) when he acquired his aunt's house for $170,000 knowing that the house was worth "substantially more." The hearing committee also concluded that the respondent's conduct in having his aunt sign the deed conveying her house to him, where the terms of the transaction were not fair and reasonable to his aunt and were not fully disclosed in a manner she could reasonably understand, and where she was not given an opportunity to seek the advice of independent counsel, violated rule 1.8 (a) and rule 8.4 (h). Finally, the hearing committee concluded that the respondent's refusal to account for his handling and disposition of his aunt's funds violated Mass. R. Prof. C. 1.15 (b), 426 Mass. 1363 (1998).[26]

As to the factors in mitigation or aggravation, the hearing committee found no mitigating factors, but noted that there were four factors in aggravation: the respondent's conduct in both counts was motivated by a desire to benefit himself financially; he took advantage of elderly, unsophisticated, and vulnerable clients; he was experienced in real estate law; and his testimony "evinced a lack of candor." The hearing committee recommended that the respondent be suspended for one year from the practice of law. Both bar counsel and the respondent appealed to the appeal panel.

c. *Report of appeal panel and board recommendation.* Bar counsel appealed from the hearing committee's conclusion that

rule 8.4 (h) in connection with his conduct in inducing the sisters to sign a listing agreement on June 3, 1998. The hearing committee concluded that the respondent did not violate the charged rules because independent counsel was present by virtue of Pendergast's presence and active involvement in the meeting. The hearing committee noted that even if the respondent's conduct at the June 3, 1998, meeting did constitute a violation of charged disciplinary rules, the "recommended sanction would not be altered."

[26]At the time of the hearings and effective until July 1, 2004, Mass. R. Prof. C. 1.15 (b), 426 Mass. 1363 (1998), provided: "Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property." See Mass. R. Prof. C. 1.15, as appearing in 440 Mass. 1338 (2004).

the respondent did not violate rule 1.8 (a), as well as from its recommendation of a one-year suspension. Bar counsel sought an indefinite suspension from the practice of law. The respondent appealed from several of the hearing committee's findings and rulings of law. He sought a public reprimand or a six-month suspension. Neither party objected to the subsidiary findings of the hearing committee.

The appeal panel adopted the hearing committee's findings of fact and rulings of law on both counts. The appeal panel recommended that the respondent be suspended for two years from the practice of law, and that he not be permitted to petition for reinstatement until he had made a "full accounting" of his handling of his aunt's funds.

Both parties filed objections to the report of the appeal panel. The full board voted to adopt the appeal panel's report. A divided board voted to recommend that the respondent be suspended from the practice of the law for two years,[27] with four members dissenting.

The board filed an information and record of proceedings, and a single justice reserved and reported the matter to the full court.

3. *Discussion.* On appeal, the respondent challenges several findings of the hearing committee, as adopted by the board. He also seeks a sanction of a public reprimand or a suspension of less than six months. He argues that he was deprived of due process in the disciplinary proceedings in that the board was "predisposed" to rule against him after filing an amicus brief in his civil lawsuit against Pendergast, and because a purported conflict between his former counsel and a member of the board tainted the proceedings against him. Bar counsel challenges the recommended sanction and contends that the respondent was not denied due process in the proceedings.[28]

The standard of review for bar discipline cases is well-

---

[27] The board did not issue a written decision, nor did it address the appeal panel's recommendation that an accounting of his aunt's funds be a precondition to the respondent's petition for reinstatement.

[28] Bar counsel does not appeal from the appeal panel's decision, adopted by the board, to affirm the hearing committee's determination that the respondent did not violate rule 1.8 (a) in connection with count one. See note 25, *supra.*

established. "[T]he findings and recommendations of the board, though not binding on this court, are entitled to great weight." *Matter of Hiss*, 368 Mass. 447, 461 (1975). See *Matter of Fordham*, 423 Mass. 481, 487 (1996), cert. denied, 519 U.S. 1149 (1997). We uphold subsidiary facts found by the board "if supported by substantial evidence, upon consideration of the record." S.J.C. Rule 4:01, § 8 (4), as appearing in 425 Mass. 1311 (1997). "We generally afford substantial deference to the board's recommended disciplinary sanction," *Matter of Griffith*, 440 Mass. 500, 507 (2003), but must ultimately decide every case "on its own merits [such that] every offending attorney . . . receive[s] the disposition most appropriate in the circumstances." *Matter of the Discipline of an Attorney*, 392 Mass. 827, 837 (1984). Our primary concern in bar discipline cases is "the effect upon, and perception of, the public and the bar," *Matter of Finnerty*, 418 Mass. 821, 829 (1994), quoting *Matter of Alter*, 389 Mass. 153, 156 (1983), and we must therefore consider, in reviewing the board's recommended sanction, "what measure of discipline is necessary to protect the public and deter other attorneys from the same behavior." *Matter of Concemi*, 422 Mass. 326, 329 (1996).

We begin with the hearing committee's findings of fact and conclusions of law, as adopted by the board, then turn to the recommended sanction, before discussing the respondent's due process claim.

The respondent challenges several of the board's findings[29] with respect to each count against him. As to count one, we have reviewed the entire record and are satisfied that there was more than adequate evidence to support each of the violations found by the board. See *Matter of Kerlinsky*, 428 Mass. 656, 662, cert. denied, 526 U.S. 1160 (1999). While we see no reason to provide "a point-by-point rebuttal to the respondent's arguments," *id.*, we note in particular that the respondent's argument that his filing of a lawsuit against Pendergast for filing a grievance against him did not constitute a violation of rule 8.4 (d) or rule 8.4 (h) is unavailing. S.J.C. Rule 4:01, § 9 (1), as appearing in 425 Mass. 1312 (1997), in pertinent part, renders

[29]Because the board adopted the hearing committee's findings of fact, we refer to them as the board's findings.

an individual who submits a complaint to the board or to bar counsel "immune from civil liability based upon his or her complaint." The plain language of the rule defeats the respondent's claim that he was advancing a good faith, "novel" argument to "test the scope" of a rule that has not been subject to "authoritative construction." His claim that, in so doing, he relied on the advice of counsel does not excuse his conduct. As an attorney, the respondent was obliged to be familiar with this court's rules. Cf. *Avery* v. *Steele*, 414 Mass. 450, 457 (1993) (declining to impose on client sanctions for submission of inappropriate material to court because "as a lay person [the client] would have no reason to suspect that the statements were not part of a proper legal argument"). As the board found, the respondent's conduct in filing a lawsuit against Pendergast because she filed a grievance against him was "prejudicial to the administration of justice," Mass. R. Prof. C. 8.4 (d), and "adversely reflect[ed] on his . . . fitness to practice law," Mass. R. Prof. C. 8.4 (h).[30]

As to count two, the respondent challenges the board's finding of harm and the board's finding that he was acting as his aunt's attorney in the course of their interactions. According to the respondent, his aunt wanted him to have her house, and he went to "great lengths" to attempt to establish a "reasonably fair" purchase price. The respondent does not challenge the board's subsidiary findings as to the value of the house. Rather, he claims that "it simply would have taken longer" for his aunt to "spend-down her assets and obtain Medicaid coverage" had she received a higher purchase price. The respondent's posture is an extraordinary one: he paid his aunt less than the fair market value in order to hasten her qualification for Medicaid coverage, all for his own benefit. This court declines to give its imprimatur to any such fraudulent scheme. The record is clear that at the time of this nefarious transaction his aunt was elderly, and dependent on him as her only caregiver. His after-the-fact claim that he never acted as his aunt's attorney is belied by his

---

[30]Despite the respondent's claim to the contrary, the decision of the judge in the Superior Court not to grant attorney's fees to Pendergast does not require us to conclude that his lawsuit against her was appropriate or brought in good faith.

own words: in his brief the respondent repeatedly asserts that he provided "legal" or "professional" services for his aunt without charging her.

Substantial evidence in the record supports the board's findings that there was an attorney-client relationship between the respondent and his aunt, and that the respondent's aunt was harmed by agreeing to a transaction with a man she trusted when the terms were not fair to her or fully disclosed. See *DeVaux* v. *American Home Assur. Co.*, 387 Mass. 814, 817-818 (1983), quoting *Kurtenbach* v. *TeKippe*, 260 N.W.2d 53, 56, 57 (Iowa 1977) (whether attorney-client relationship exists "must be resolved by the trier of fact" and may be implied "when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance"). Our review of the record confirms that the board's findings as to both counts are supported by substantial evidence. See S.J.C. Rule 4:01, § 8 (4). See also *Matter of the Discipline of an Attorney*, 442 Mass. 660, 667 (2004). We now turn to the issue of an appropriate sanction.

The seemingly unrelated incidents of the respondent's improper conduct cannot be viewed in isolation. See *Matter of Palmer*, 413 Mass. 33, 38 (1992) ("it is appropriate for us to consider the cumulative effect of the several violations committed by the respondent"). In two separate matters, the respondent engaged in "clear, personal conflicts of interest with elderly, unsophisticated and vulnerable clients," in the words of the hearing committee. The respondent's conduct reflects an insensitivity to his obligation of absolute fiduciary fidelity to those whom he counselled, combined with a pattern of self-dealing and self-enrichment at their expense. His conduct is particularly egregious as concerns his aunt who, the record is clear, relied on him for advice and counsel. The obligation of an attorney to those he advises does not terminate because of the existence of a familial or close relationship, or because he is not compensated for his services. Such a relationship requires that the attorney exercise the greatest care because the level of trust placed in his advice will likely be all the greater. For these

reasons, we agree with bar counsel that a two-year suspension "does not give full weight to the extended and predatory nature of the respondent's misconduct."

The standard of review for a recommended sanction is "whether it is markedly disparate from judgments in comparable cases." *Matter of Finn*, 433 Mass. 418, 423 (2001), and cases cited. Regarding count two, which the hearing committee characterized as the more serious violation, we agree that the respondent "intentionally withheld information" concerning the actual fair market value of his aunt's property, misrepresenting its value to her, while he reaped a substantial benefit at her cost. Bar counsel emphasizes the similarities between this conduct and conversion of client funds, for which the presumptive sanction is disbarment or indefinite suspension.[31] See *Matter of Schoepfer*, 426 Mass. 183, 187-188 (1997).

While there is a distinction between the respondent's intentional misrepresentations that inured to his financial benefit, and the intentional deprivation of client funds, for purposes of comparable sanctions the two forms of misconduct bear remarkable similarities. In both cases the attorney benefits financially from his misdeeds at the expense of clients. We therefore conclude that an indefinite suspension is appropriate. Cf. *Matter of Schoepfer*, *supra* at 186; *Matter of Elias*, 418 Mass. 723, 725 (1994); *Matter of the Discipline of an Attorney*, 392 Mass. 827, 836 (1984). See *Matter of Alter*, 389 Mass. 153, 156 (1983). Cf. *Matter of Palmer*, 423 Mass. 647, 651 n.1 (1996) (attorney disbarred where his professional misconduct "involve[d] a pattern of gross impositions on older women who appear to have been in 'a particularly vulnerable condition' "). The sanctions imposed must "provide a strong deterrent to lawyers engaging in such practices, and a clear showing to the public that their interests as clients are matters of major concern and will be protected." *Matter of Schoepfer*, *supra* at 188.

---

[31]We reject the respondent's argument that, in light of the board's finding that he and his aunt had an attorney-client relationship, a more appropriate analogy for his action in retaining for himself $75,000 of equity in his aunt's house is that his actions were " 'like' charging an excessive fee, except that the $75,000 bar counsel alleges are the damages would not have been excessive for years of effort on his aunt's behalf." The respondent denied the existence of an attorney-client relationship and never submitted any bills for services rendered that his aunt might have challenged.

We reject the respondent's argument that this case is like *Matter of Wise*, 433 Mass. 80, 80, 92 (2000) (six-month suspension appropriate for attorney whose actions in connection with single matter were "marked by a conflict of interest," and "motivated by selfishness and anger," but caused no harm), or *Matter of Pike*, 408 Mass. 740, 745-746 (1990) (six-month suspension for attorney's single incident of misconduct, his representation of both landlord and tenant in lease negotiation, affirmed, although "[i]f there had been a recommendation of a suspension of one year, the court would have followed it"). Here the record reveals a pattern of misconduct, some incidents of which occurred during bar counsel's investigation. See *Matter of Saab*, 406 Mass. 315, 327 (1989) ("consideration of the cumulative effect of several violations is proper"). The two-year suspension recommended by the board would be markedly disparate from the discipline imposed in similar cases. See, e.g., *Matter of Luongo*, 416 Mass. 308, 311-312 (1993) (indefinite suspension for attorney who commingled funds as to work intentional, although temporary, deprivation of client's use of funds; associated with nonlawyer; and failed to cooperate with bar counsel's inquiries); *Matter of Voros*, 11 Mass. Att'y Discipline Rep. R. 287 (1995) (indefinite suspension for attorney who misrepresented his legal expertise, net worth, and financial viability of partnership in which he engaged with client whom he failed to inform of conflict of interest). Cf. *Matter of Segal*, 430 Mass. 359, 368 (1999) (two-year suspension for experienced real estate attorney who made false statements and material omissions regarding improper loans); *Matter of McIntyre*, 426 Mass. 1012, 1015 (1998) (two-year suspension for mishandling of client funds). Here, the respondent's conduct was far more egregious than conflicted representation. His conflicted conduct is characterized less by a divided loyalty and more by a motivation to subjugate the interests of his clients to his own.

As to restitution, the respondent asserts that the appeal panel incorrectly determined that he had not provided a full accounting of his aunt's funds to Gallinelli. In support of this claim he points to several exhibits submitted to the hearing committee in the course of these proceedings. The respondent further argues

that there is no basis in the record on which to order restitution, as the hearing committee did not establish the fair market value of the house or calculate an offset for the value of his services. We disagree, as there is a basis for restitution. But we cannot on the record before us determine with certainty an appropriate amount of such restitution.

The respondent submits that documents he provided to the hearing committee, which were entered in evidence, styled "Paper Trail of Lena Lupo's Finances" and dated March 18, 2002, together with copies of bank statements and checks, provide "all of the information that would be in any meaningful accounting"; however, we are in no position to undertake that task. The respondent does not dispute the hearing committee's subsidiary findings, which valued his aunt's house as worth at least $240,000, at the time he purchased it for $170,000. A difference between the purchase price and the amount determined by the hearing committee to be the fair market value of the house may not reflect the correct amount of restitution, however. The respondent submitted to the hearing committee documentation concerning repairs he made to the property, from which the hearing committee estimated that he had spent approximately $7,600 on the house by July 20, 2000. The hearing committee also received evidence to the effect that the respondent had been receiving rent for the property since the summer of 2000, "initially in the amount of $1,600 per month," and as of the issuance of its report in November, 2004, $2,450 per month.

From all of this evidence we conclude that restitution to the aunt's estate is appropriate. However, we are unable to discern on this record the appropriate amount of restitution taking into account all of the relevant factors: the purchase of the house below the established market value, the respondent's benefit to himself from the house, and expenses he may have incurred. We therefore remand to the board for a prompt hearing on, and determination of, an appropriate amount of restitution. The indefinite suspension of the respondent shall not be stayed pending that determination.

We now consider the respondent's due process claim to the effect that he was denied a fair hearing. There is no indication in

the record that the board chair, who denied the respondent's motion to dismiss the petition for discipline against him, was biased against him. The respondent's claim to the contrary is no more than speculation.[32]

An order shall enter forthwith suspending the respondent indefinitely from the practice of law. Separately, the question of restitution (count two) only is remanded to the board for a determination of the appropriate amount of restitution. The respondent shall not be permitted to petition for reinstatement until he has made full restitution of such amount, unless by an order of this court.

*So ordered.*

---

[32]The respondent bases his due process argument in part on the submission by the board's counsel of an amicus brief concerning Pendergast's immunity from civil liability for filing a grievance against him. The respondent advances nothing to counter the board's assertion that it limited its brief to an expression of the position that Pendergast was immune from civil liability, and offered no opinion regarding the respondent's dealings with his clients. That the board would intervene in such a case is not unforeseeable; by protecting complainants from being sued for reporting lawyer misconduct, S.J.C. Rule 4:01, § 9, serves the important purpose of eliminating a deterrent to the filing of grievances. Furthermore, there is no evidence that the respondent's former attorney, who sued the later-appointed chair of the board in an unrelated matter, ever appeared on the respondent's behalf in connection with formal disciplinary proceedings against the respondent or that the chair was aware of the lawyer's association with the respondent at the time he denied the motion to dismiss.